Good morning, and may it please the Court, I'm Joseph Wiseman. I am counsel for Appellate Arceneaux in this appeal. Your Honor, with respect to the time, we collectively on this side of the aisle will request a 10-minute time for rebuttal. Well, it will be out of your 40 minutes. That's totally fine. That's correct. We're aware of that. Thank you. Just be sure you don't go over 30 on the first. Very well. Thank you. I suspect that everybody will come in under a lot of time in any of this. Very well. Your Honors, what I'd like to do is focus my brief presentation on the issue which I consider to be a substantial problem in this case, and that was the way in which the defense was stymied, if you will, in terms of the cross-examination of the government witnesses. What I believe is a salient factor in this particular case is that, for example, with respect to my client, Mr. Arceneaux, the case, the government's case, relied upon the testimony of the cooperating witnesses, albeit said if the government will say it was not a cooperating witness. But in reality, I think if one reads the record, it appears that she could quite easily have been indicted, although the government takes the position that she was uninterested. Nevertheless, with Arceneaux's case, it relied solely on the witnesses for the government, all of which said it had cooperated. The problem, as I addressed in my opening brief, in my view, is that the trial lawyers were stymied by this inability to cross-examine the government witnesses after they testified. As the record discloses— You're referring to the seriatim presentation. Exactly, the seriatim problem. Now, that was, I think, borne, if you will, by the fact that the Jenks, the government, taxed strictly to the— Well, that's not a Jenks issue, though, is there? Well, Your Honor, I don't think there really is a Jenks issue insofar as what I addressed in the brief. However, as the Court knows, the Jenks issue was raised before the magistrate judge. There were extensive pretrial motions on the Jenks material. The defense attempted to get the Jenks material early and was not provided with that. There was no violation of Jenks as far as I could see. Strictly in the sense of looking at Jenks. Strictly, it wasn't violated, period. I agree. And that was the problem, Jenks. You got the stuff late. We got the stuff late. The Court, in my view, didn't exercise its discretion. You know, it's—I'm not criticizing you, but it's easy to say that cross-examination was stymied. But in what respect? How? You have to be more specific than that, because you were given an opportunity to recross your side, and I didn't see that anybody was recalled. Did I miss something? No, the defense did not recall the government. Right, so they were given the opportunity. You got any problems, you can recall them later. So exactly how did this cross-examination? My view of the problem is this. As trial lawyers know, when you have a situation where the government presents witness after witness after witness without any real breaks—this is a Friday afternoon, the jury goes home for the weekend— my view is that that sequence, without an eruption, without any interruption, allowing the defense to cross-examine, was such that the jury was left with the government's case in toto, albeit there was an opportunity to cross-examine, it was several days later, and that was the problem with the cases I saw. See, that's all an abstraction. Do you have any cognitive psychology or tests or studies that suggest that that's a real problem? I mean, trials start, trials end. Witnesses sometimes testify five months before the trial is over. I just don't see anything suggesting that a delay, per se, is a problem. Do you have any cases that say that that's a problem? Your Honor, this is, I think, a unique point. Do you have any cases? I cannot point to a specific case that would support reversal of a conviction based upon the way the district court allowed the case to proceed. Do you have any cases that even suggest that this may be a problem under certain circumstances? Well, my view is that it's a problem in this particular circumstance when you have nothing other than the testimony. There are no cases that support you. There are no cases that I can cite that support me specifically. So this will be the first. This should be the first. And we are under a standard of review of abuse of discretion, are we not? That is correct. But my view is the district court judge didn't exercise his discretion in making the decision. There were ample pretrial motions that were filed in this particular case. My view is that the court should have been more cognizant of the potential problem that the case was going to cause by, one, not getting jinxed, albeit it's not a violation, but just the way the case was presented by the government, the defense did not have the opportunity to really present, in my view, an effective defense. Had there been corroborating evidence, I wouldn't be standing here making this argument, but with respect to Mr. Arsenault, there was nothing but the government's witnesses. That was it. How much jinx material was disclosed after each witness testified? Your Honor, it depended on the particular witness. My recollection from the record, there was something about 150 total pages of jinx material. Pardon me, Your Honor? 154. 154. And as I said, depending on what witness it was, my recollection is that the jinx material on Slater, who was the key government witness, was fairly substantial, 46 pages. And that is, I think, substantial with respect to what he is attempting to do. Did the jinx material reveal anything that the defense wasn't already aware of? I'm sorry, Your Honor? Was there something new about the information contained in that jinx material? Well, Your Honor, the jinx material would have provided, in my view, the trial lawyer who represented Mr. Arsenault a better opportunity to cross him out. No, but Judge Pius asks, was there anything in the jinx material that exploded the direct testimony of the witness? In other words, an inconsistent statement, something like that. I am not aware of an inconsistent statement that was in the jinx material for Mr. Slater, Your Honor, that I can specifically point to. But what it did was, it didn't give the defendant the option choice that the defense was laboring under was either they wait for several days before they can cross-examine or they ask for a short continuance, which I don't know if the court was going to grant, to prepare for cross-examining the key government witness. Well, why couldn't it equally be argued that by allowing this delay, that the testimony on direct faded and gave the defense a freer shot on cross-examination because it wasn't close to the direct? I mean, all of this is just speculation, in my view. It's total speculation. Well, Your Honor, it is a degree of speculation. However, we're looking at, in my view, a fundamental question of a due process right. You tell us the jury sort of forgot the direct examination sunk in to such an extent that no cross-examination could have blown it apart. How do we know this? We just don't know it. We don't know it, but I think empirically we can make the argument, when you have a case as complex and as serious as this case, and the potential sentence that my client received was not over 900 months. Okay, we'll go back to empirical. Do you have any empirical data, studies, or tests that, in situations like this, take a look to see what happens when you have a delay between direct and cross-examination? I can't point to anything in the record that would support that. The only thing I would say, I think this case is somewhat analogous. I think, Your Honor, in your 1996 law review article at the Hastings Law Journal, you talk about the potential problems that any particular prosecutor has with a cooperating witness. I spent an entire career on that. I'm aware of that, and I think in this particular case, with respect to my client, the way in which the government was allowed to present the evidence was such that it violated his constitutional rights. And, Your Honor, I'll submit the, unless there are further questions, I want to defer to my colleagues. I will submit the other arguments. Very well, counsel. Thank you. Good morning, Your Honors. I'm John Ward. I represent Mr. Rogers. And I would like to focus on the witness, Takina Suttoth. As I pointed out in my brief, Mr. Rogers was convicted of two counts and acquitted of two others. And it appears that the only difference was that in the counts of which he was convicted, in addition to an identified cooperating witness, the government also presented Takina Suttoth. Is your issue the fact of the denial of an evidentiary hearing? Yes. Okay. And I believe that there was sufficient circumstantial evidence to require more. Well, give us the showing. What is the showing that you think? Okay. The showing is that Mr. Wong, as he acknowledges in his brief, knew when he first interviewed Ms. Suttoth that she rented the hotel room and that she received money. He also knew from DeMond Vaughn, one of the other cooperating witnesses, that she was in what Vaughn called the lookout car during the Manteca robbery. Secondly, when defense counsel attempted to contact her, she refused to talk to them and called Mr. Wong. Thirdly, the judge asked Mr. Wong were there any offers. And this raised a red flag. Mr. Wong said, no, there were no offers. However, this raised a red flag with defense counsel who said, well, what we really want to get to, was it communicated in any way to her that, yes, we decided not to prosecute you and that that depends upon certain things. So that's basically what we have. She says nothing. No, she says no, but as Mr. Wong said in his brief, her value as a historian is dubious, you know. And I think as Mr. Bigelow will tell you, in the end of the day. I like that phrase. I'll put that in another interview sometime. Her value as a historian was dubious. I was very pleased. And I think as Mr. Williams will tell you, Ms. Sudduth tried to retreat from her identification of his client in the companion case, and the prosecution was very stern with her. You don't tell the truth, you go to jail. All of this is true. But it all creates the impression, how did the Belushi get the summons to come to the grand jury? She says she doesn't know anything that it's about. She never calls a lawyer. It just has a smell that I think. What's your best case analogous to this that might give us? DeMarco, I guess. DeMarco? Yeah. And also this circuit's case in Ramirez. The standard of review is for an abuse of discretion? Well, both Mr. Wong and I agree that where an allegation of a Brady violation or an immunity violation is alleged, that it's de novo. So what did you want the district court to do? What did you ask the judge to do? Well, there were a couple of things. First of all, when it first came up, he asked discovery of all the agents' notes and so forth, just somewhere to begin. I mean, obviously you couldn't ask Ms. Sudduth, because that would have been naive. And then later it came up again, and I think they asked for a mistrial, and they asked for- No, I'm asking what did they ask the judge to do? Did they ask for an evidentiary hearing? They did ask for an evidentiary hearing. They asked for a mistrial. They asked for- Was it before the trial began? Correct. Was it before the trial began that they asked for- No, no, no. Ms. Sudduth wasn't on the witness list, and she just kind of came in as a bit of a surprise. Not a total surprise in the sense that she was in discovery, but there she was. And then after she testified, various defense counsel began to raise the roof and at first asked, as I say, to look at the notes. The judge said, show me more. It came up again. They asked for a mistrial because I think what spurred the request for a mistrial is that she denied on the stand having called Mr. Wong, which was not true. So in that case, they asked for- So your argument is that there was circumstantial evidence that there was some agreement or implied agreement? Yeah, funny. I mean, in the sense that it just doesn't- She grew up with these guys. She tried to recant on Williams. You know, there's just too much to say that we can pass over this without taking a look at it. The hearing, who knows what's going to happen, but I do believe it should be had. And if the Court has no further questions, I submit. Thank you, counsel. If it pleases the Court, my name is Michael Bigelow, and I represent Derek Maddox in this matter. And when counsel, who immediately preceded me, referenced Williams, he was, in fact, referring to Maddox. I was going to say, with respect to Ms. Suttoth, that the trial lawyers in this room, even if they're not trial lawyers, and I was expecting a lot more lawyers when I thought about this, would love to try to present to the jury and would be able to present to the jury beyond a reasonable doubt that there was something going on with respect to Suttoth. I don't know what it was. That's the problem. Counsel doesn't know. You mean all the crying and the thrashing around that we see in our testimony? Some kind of an implied or soft words of hope that you will not be prosecuted. There's another crime in here. There's not just aiding and abetting. There's misprison. She acknowledges in the first trial. I'm the second trial. We kind of need to keep that in mind. She acknowledges in the first trial that she knew as she was driving to Los Angeles that something had been going on, that there was some kind of a crime. There was no effort to report it, none of that. That's a good misprison. She testified in grand jury that she did not know Derek Maddox. She testified, or at least she made at least two statements to law enforcement. She did not know Derek Maddox. Those are crimes. Last time I counted, those are crimes. They weren't charged in any event. What's disconcerting about all of this, at least from my perspective, is that Mr. Wong did the same thing in my trial that he did in the trial that preceded, in the Williams trial. In the Williams trial, he deflected the question. The question was, did you talk to Suttup? He went on for a while in a hearing. He went on to say, I don't remember, it's irrelevant, it is this, it's that, it's the other thing. He never answered the judge's question. He never answered the question put to him. And it was important to know whether, in their trial, whether he had in fact talked to Suttup. And it was during trial that they, in the other trial, asked for time to call Maddox's lawyer from Minnesota to bring him to court to testify, to have a hearing, whether there was in fact something going on. The judge denied that. In my trial, Mr. Wong, when we were confronted with Suttup's tears in court, Mr. Wong said, oh, she had a baby. She just had a baby. I'm going to try to get through this. We go through a bit of cross-examination, or a direct examination, at least. She asks to approach the bench, or asks to speak to the court directly. She says she's been threatened. All of us in the room believed, honestly, that it was Mr. Maddox, or somebody from the defense side. It turns out it wasn't Mr. Maddox. It turns out she had been threatened by the prosecution. Mr. Wong had apparently told her, you are committing perjury if you recant. One of the critical aspects of that is that he had not told me, and he wasn't prepared to tell me. Who's he? You say he. Mr. Wong. She had recanted. Wait a minute. You say she would be committing perjury. Didn't Mr. Wong say that she would go to jail if she testified differently from before? That's correct. There's some language in there about perjury. There's some discussion about perjury. But, yes, that is what he said. And we're talking about a government witness now. We're not talking about a defense witness. We're talking about a government witness. Well, we are talking about a government witness, yes. And there is a distinction, and I understand that. All right. But he had been given an opportunity to tell me that she had recanted. He did not take that opportunity until the judge asked him directly at, I think it was D.R. 29, but somewhere during that timeframe, the judge said, is there something else going on here that I don't know about? And I might be paraphrasing slightly the judge. And the judge said, oh, yes, she recanted, is what Mr. Wong said. First time I knew that she had recanted her previous testimony. What, in effect, Mr. Wong had done is forced a script on Ms. Sutta. That script effectively foreclosed my cross-examination of her. She had to stick with that script in order to not go to jail, at least in her mind. Her testimony in the second trial. Her testimony in the first trial. No, she testified in the first trial a certain way. And at the second trial, as I recall, didn't she sort of backstep from what she had said in the first trial? I didn't do a bad job of cross-examining her. Yeah. Yeah, she backstepped. But I had to show her grand jury testimony or talk to her about a grand jury testimony. I had to talk to her about a 2302. But you just suggested that she was following a script. The script of the first trial. That is what she was concerned about. But she did her testimony, but she didn't adhere to everything that she testified in the first trial. No, except that she was in tears. That's absolutely correct. She was in tears. And Mr. Wong goes to great effort to, at some point, he goes to some effort, at least, to remind her again at the conclusion of his direct examination and to remind the jury in his closing argument that she was in tears. Now, at the conclusion, or at the second time at least, that he reminded her that she was in tears and asked her if he was afraid, I objected. Thereafter, I approached the bench and I said, Look, he is leaving in the minds of the jury that Mr. Maddox is the one who caused the threat. I want to go into that. I want to find out why she's in tears and why she is now obviously hesitant during her testimony. And the judge said, no, you cannot do that. I think I was denied a right to cross-examine. Did she have a lawyer? We tried to get her a lawyer, Your Honor. Did she have a lawyer? The answer is no. She did not have a lawyer. The answer is no, she did not. All right. The suggestion is that if it were error, it was harmless. What's the prejudice? The prejudice we will not fully ascertain until they have their hearing. The prejudice immediately, however, is that Suttoth was, in my trial at least, was Mr. Wong's corroborating witness. Vaughn was a good corroborating witness, but he wasn't perfect. I had some stuff to talk about. It's in the transcript and I acknowledge its shortcomings and Mr. Wong will point those out. I'm certain. But Vaughn was not a perfect cooperating witness. The government needed Suttoth to corroborate that testimony. They needed somebody as clean as the pure, driven snow, and that was Suttoth. I could not sully her because I didn't, number one, I wasn't given an opportunity to cross-examine. And number two, I don't think we knew the rest of the story. It's just too clear from reading their briefs and their transcripts and their sidebars that Suttoth, when contacted by the government, when contacted by defense investigators, contacted the lawyer in Minnesota. Now how in heaven's name did she know to contact the lawyer in Minnesota? Unfortunately, nobody has a specific memory of it at sidebar. Maybe they all will at some kind of a hearing. But thereafter, Suttoth calls Mr. Wong. Now you're suggesting that somehow this lawyer in Minnesota has something to tell us about this? No, because it was a big issue in my case whether Ms. Suttoth had contact with, a big issue in my case whether, one, Ms. Suttoth knew my client was in Minnesota in custody and had contact with Ms. Suttoth in Minnesota. How does the lawyer in Minnesota play into all of this? I'm not following that. He could confirm that Ms. Suttoth did in fact have contact with him and did in fact know that Maddox was in Minnesota. So where's the affidavit from him? Well, Mr. Hughes never testified. Nobody ever tracked that down, right? They did track that down. Well, what's the answer? The answer is he has no recollection of who contacted him, of the name of the person who contacted him. I called the other lawyer. So the person couldn't offer anything? I'm sorry, Your Honor. So this lawyer in Minnesota can't offer anything? Circumstantial evidence. What does the lawyer say about what the lawyer said to the person who contacted him? That he received a phone call. I wasn't part of that, Your Honor. I know, but you're raising it. I've got to find out what happened. I'm raising it in the context in which they're raising it. He received a phone call from a woman while he was in Minnesota asking why a defense investigator was contacting her. She thereafter contacted Mr. Wong. A conversation Mr. Wong does not recall, apparently. She denies emphatically that she contacted, one, Mr. Wong, two, a lawyer in Minnesota, three, that she knew Mr. Maddox had some kind of relationship with Minnesota or was in Minnesota. I'm still failing to get out of any of this the idea that she had a promise with respect to her testimony that she wasn't going to be prosecuted. We don't know. That's the problem. Counsel, you're down to about 15 minutes for your side. I know, I know. Good morning, Your Honors. May it please the Court, I'm Lindsay Weston. Yes, Your Honor. Yes, Your Honor. Good morning. Good morning. Can you hear me? I represent Appellant Michael Dennis Williams in this case. The record and the law in this case supports that this Court should reverse the convictions for all three defendants, and particularly Mr. Michael Dennis Williams, on the basis of plain error because the prosecutor's continuous, egregious vouching during the closing argument in this case denied the defendant a right to a fair trial. You know how hard plain error is to demonstrate? Absolutely. There were no objections as to any of this stuff. Your Honor, I conceded that in the first paragraph. I know. And so what I would like to do is just briefly discuss the vouching and then cut to the chase, which is how this Court, under Witherspoon, Kerr, I think the pronunciation is Nicotia, looked at plain error and in a case where there's been no objections made, but most importantly where the cooperating witnesses or the witnesses' credibility is central to the evidence. Even though there were no objections, there was a curative instruction, wasn't there? Your Honor, I think there was not a curative instruction that was necessary in this kind of case, and I'll address that just briefly, Your Honor, as soon as I get into the vouching. We know what vouching is. It's black letter law, what vouching is, which is placing the government's personal assurances behind the credibility of the witnesses or indicating to the jury that there is evidence outside of the jury's knowledge that supports the credibility of the witnesses. Given that that's what vouching is, this prosecutor said to the jury in rebuttal, I can assure you that neither of us, meaning the judge, nor I, are gullible enough to fall for a pack of lies. That was in relationship to a bunch of lies. Thank you. You know, I've practiced this so many times that sometimes it just goes out there. Okay. That was taken, I, the government, the guy with the white hat, can assure you, the jury, that we're not going to fall for a pack of lies. Mr. Wong put the witnesses on after having these witnesses being questioned by the FBI. There is no other implication to that jury than this prosecutor believes that these witnesses are telling the truth. In what response to what did the prosecutor say that? What's the context? What provoked that as far as you can tell? Your Honor, I think because I'm What was the argument that the prosecutor was responding to? He said the witnesses promised to tell the truth as part of their plea agreement. I'm not the final arbiter. The judge is, and I can assure you. He was, it was in response to, in response to defense, the defense questioning the credibility of these cooperating witnesses, which is all they had to do. However, the vouching that the government engaged in, the personal assurances, can never be justified by, in response to what the defense does. Never. The next thing that the government did, the prosecutor did, now this court knows Mr. Wong. I mean, this court has to know that Mr. Wong is a seasoned veteran prosecutor. Okay. I don't know him from a grape. Maybe you don't know him personally, Your Honor, but he's appeared in front of this court numerous times to argue in cases. The next thing he said is, I, again, interjecting himself personally in this case, I'm going to do something that I've never done before. And it goes into what the FBI did. The FBI, they probably would not have solved this case but for DeMond Vaughan. Again, that is black-letter law vouching about the credibility of an incredibly important witness in this case, that law enforcement believed Mr. Vaughan because he solved the crime. Throughout the remaining of his closing argument, Mr. Wong interjected himself improperly, always in relationship to the credibility of these central witnesses, which is we, we law enforcement did everything that we could, excuse me, law enforcement. And at the very end, he says, I want you, I want you to convict and to bring justice to these victims. I think there's no question that Mr. Wong engaged in repeated acts of misconduct directed at the credibility of these witnesses. In response to your question, Your Honor, in a closed case such as this, where the credibility of the witnesses is central to the government's case, and there's no question that it is, this Court has to acknowledge that given the fact that both sides argue this completely in their opening arguments and closing arguments. A general curative instruction is insufficient, and I think the Court can look at that under Weatherspoon and Kerr. The curative instructions in this case were boilerplate. Number one, a jury instruction that's given in every single jury trial, which is the statement of the attorneys, are not evidence. That's boilerplate. Secondly, the two remaining jury instructions, which this Court asked about curative, have the, I think they're jury instruction 18 and 19, which are also boilerplate when you have cooperating witnesses and witnesses who've testified who have felony convictions. This Court has held that in this kind of case, a general curative instruction is not sufficient, that the Court needs to, the Court needs to at the time of a misconduct, especially the egregious misconduct, where Mr. Wong joined the authority of the district court. The district court sat there, allowing its imprimatur of monitoring the witnesses' truthfulness, and did nothing. Let's assume for the sake of discussion that there was error of this kind. Yes. That it was plain error. Yes. What about prong three and prong four? How did it substantially affect what was going on, and why should we acknowledge it prong four? Okay. I think that's what I was trying to cut to the chase, but I cut to the chase a little bit late. Mr. Williams was convicted of two crimes, the Hilmar robbery in March, and the September robbery of the Nantica Financial Credit Union. The three main witnesses against him were the cooperating witnesses, were DeMond Vaughn, DeMond Looney Vaughn, Papa Slater, and Amos Jackson was not involved in that. However, the government bootstrapped his testimony by saying that there was the same M.O. Okay. So these three witnesses were crucial to the government's case. In Hilmar, Your Honors, the only other evidence, this court includes cases where the witnesses' testimony, the credibility of the witnesses, is central to the government's case. It will have to look like under Brooks to see if there's substantial independent evidence of guilt. There was no substantial independent evidence of guilt in this particular case. In Hilmar, Your Honor, in the Hilmar case, Papa Slater testified that there was a robbery. Okay. Counsel, your side is down to just under seven minutes. Okay. I will then say something else. The only other thing that connects Mr. Williams to that robbery was the highly suggestive, impermissible, insubstantial identification of him three years after the fact when the witness, Thomas Anderson, could not identify him, could not get any description of the third robber who was supposed to be Mr. Williams. He testified that he saw one African American who was heavyset and a female, not supposed to be Mr. Williams. And then in a highly suggestive in-court identification with Mr. Williams being the only person there wearing glasses, identified him three years later when he could not make any identification to the sheriff or the FBI. In the September robbery in Manteca, we have two cooperating witnesses, Papa Slater and Devon Looney-Vaughn, and then the only other evidence of Mr. Williams' involvement is the testimony of Dakinis Sedis, which I maintain, Your Honor, is not the substantial independent evidence that's necessary. Why not? Why not? Because, Your Honor, I mean, this court has to know it. The evidence, the record reflects that she was clearly involved in this case, you know, that she was involved at least as an aider and abetter. She changed her testimony. You don't have a finding by the district court that she was not? I mean, the district court, you've probably read what the district court said in denying the evidentiary hearing. No, excuse me, Your Honor. Your Honor, this court is required, this court is required to determine whether Ms. Sedis' testimony was the kind of substantial independent evidence that would support a conviction. And there's nothing in the record that would show that. She changed her testimony numerous times during her trial testimony. She changed her testimony from the grand jury testimony. She said she could remember three years after the fact. She changed her testimony in front of the grand jury as to what she said to Mr. Williams. And I give extensive cites, I give extensive cites to the record in my very lengthy brief and statement of facts. Your Honor, this seasoned prosecutor committed misconduct during his closing argument. There needs to be a line drawn. In this particular case, the fairness of this trial was polluted by the assurances of this prosecutor as to the credibility of the cooperating witnesses, something that is simply in the purview of the jury and not the prosecution. Thank you. Thank you, counsel. The appellant side is down to about four minutes for rebuttal, so you keep that in mind. We'll now hear from the government. Good morning. My name is William Wong. I'm an assistant U.S. attorney from the Eastern District of California. Your Honor, let me start by addressing what Mr. Wiseman talked about. To Tina Sutter, the only evidence against her was that she rented the rooms at the Motel 6 after being given money from Mr. Arsenault, who was dating her at that particular case. Was she afraid she was going to be prosecuted? Not that I was aware of. She never asked for counsel. She was cooperating. What she was most scared of in the context of this case is she lived in the same neighborhood with Mr. Maddox. Mr. Maddox's uncle dated her mother. They were closely intertwined. How did she come to your attention? She came to our attention through Mr. Vaughan. Mr. Vaughan, Christmas prior to the indictment, went to law enforcement in Los Angeles, out of the blues. He basically went to law enforcement and said, I know information about some robberies in the Central Valley. He was not under arrest. We didn't even know who he was. He said, I need to change my life. This is what happened. And he says, I want to talk to whoever is investigating this case in the Central Valley. And that was us. The FBI in Los Angeles called us. We went down there. We spoke to Mr. Vaughan. He says, this is what happened. He talked about a motel. He described where it was. Okay, but how did SUDDUP get into it? I'm getting right there. He told us about this motel, where it was. The FBI went to that motel, and Mr. Vaughan indicated what rooms there were, approximately. They checked the dates, the approximate dates of the robbery, checked those rooms, and found out that Tina SUDDUP was the person who rented the rooms. That's what led to Tina SUDDUP. Who first contacted her? The FBI did. All right. Do we have anything from the FBI showing exactly what the nature of that contact was and whether she asked, am I going to be prosecuted at any time? No, there was no discussion. The FBI never promised her anything. How do we know that? Well, only what they told me. The FBI has no authorization under the code to authorize any offers to any witness. So when we spoke to Ms. Vaughan, Ms. Tina SUDDUP, the only information we had was she rented the rooms after giving money by Mr. Arsenault. The defense claims that in the registration, she didn't put down the registration or the license plate number. Okay, so you're saying you had nothing against her that would be sufficient to prosecute. I had the fact that she rented rooms, she didn't put down registration numbers, and that she received $200 out of $117,000. When did you learn that she was in the—I figured which robbery it would have been, but she was in the vehicle, there was a woman in the vehicle. Was that her? Mr. Vaughan told us that there was two vehicles that traveled up from Los Angeles. They all came from a certain neighborhood in Los Angeles, came up to the Central Valley, and she was in the Volvo, or the Volvo station wagon, along with Mr. Arsenault and some other people, including Mr. Slater, and that Mr. Vaughan was in another vehicle with three other gentlemen. What was the purpose of that convoy to the Central Valley? Well, there was a meeting in Los Angeles to discuss possibly doing a robbery. After the meeting, they picked up certain people, and then their caravan up to the Central Valley. Was Sedek in that meeting? No. She was in the car, though? She was in the car, and in the car— And there was no discussion in the car about what they were going to do? In her testimony, there was no discussion whatsoever about a robbery. She also had a relationship with Mr. Rogers at a previous occasion, a sexual relationship, as well as a sexual relationship with Mr. Arsenault. Were they carrying guns with them? They had guns with them in the car, and in the drive up, when they stopped at a convenience store to get some gas, Mr. Slater was asked by Mr. Arsenault to check the hood, meaning lift up the hood to see if everything's okay. Mr. Vaughan testified that he heard Mr. Slater holler that everything's fine with the gun. Mr. Vaughan also testified he saw them put guns into the engine compartment of the hood. Sedek never saw that? We don't know where she was at that point, whether she was in the bathroom, in the car, sleeping. Did you ask her if she saw guns in the car on the way up? No one asked her that question, Your Honor. Why not? Well, I asked her myself, but that was not on the record because she told me she didn't. I wouldn't ask her that question for the jury because I knew the answer was no. She was kept out of this. Why did you resist an evidentiary hearing? I did not resist an evidentiary hearing in the sense that there was nothing more than an evidentiary hearing. But keep in mind, throughout the whole trial, there was an evidentiary hearing. The court allowed the defense, and they asked her and asked the agents about any implied promises. Throughout the trial, they did this. So the whole trial was an evidentiary hearing. And she always emphatically denied there was no offers. No one said to her with a wink of the eye or any promises or any soft telling. Did the FBI agents testify during the trial about their initial contacts and discussions with her? The agents were available. They did testify. They were available for cross-examination. The defense attorneys asked the agent, Agent Cipolla, about these purported offers, and he said no. There was never a discussion about an offer. There was never a discussion about her having any criminal liability. Simply they were trying to get information from her, which led to other evidence that was eventually put before the jury. Thank you. There was evidence, though, that she was an aider and abetter at the hotel. Well, it depends. If your evidence is that Mr. Arsenault gave her money and says, go rent a motel, and she doesn't know why she's renting a motel, other than the fact there's a two-car caravan that's going up, and she's just simply told to rent a motel because she has some kind of ID, what evidence is there that she is involved in a robbery? When they came back after the robbery, did they go back to the motel room? After the robbery, no. They went to a different location, right? They went to the Manteca Bank, and she was in the car parked away from the bank. So she indicated she did not know what was going on inside the bank. She was with them, and Mr. Slater, Ms. Arsenault, and one other gentleman in the vehicle with her in a location away from the bank, and she did not see what went on inside the bank. How about when they got to the location, the safe location, and they emptied out, what was that, $100,000? $117,000. She testified she saw a lot of money. She wondered where they got it from. They wouldn't tell her. This is not a situation where a woman like that would ask people, hey, where did you get that money? These are violent criminals. You don't ask those kind of questions. And simply, Ms. Arsenault gave her $200. How did she know they were violent criminals if she had no idea what was going on? She lives in that neighborhood, Your Honor. So she traveled up north in a car for up to eight hours with a bunch of people she knew were violent criminals, and they talked about the weather and the Super Bowl. I don't believe they talked about hardly anything. She testified they were asleep. This happened at night around 1030 when the drive up from Los Angeles occurred. By the time they got to the Central Valley, it was well past the morning hours, perhaps two or three in the morning. So there wasn't a lot of discussion going on during that ride. I mean, the timing wouldn't allow for people to be up and talking.  One second, Your Honor. If I may, Your Honor. So the only evidence we had was those three things. She went into the room, she didn't put down the license plate number on the registration, and she received $200 at the very end. So your point is there wasn't enough of a showing to require an evidentiary hearing? No, because there really wasn't anything there. I got you. But the court never precluded the defense from asking those questions during cross-examination. She was extensively cross-examined by all the defense attorneys about this very same issue. And furthermore, the agents were extensively cross-examined about this too. So why is there a need for an evidentiary hearing? One of the other issues they bring up is that you apparently said something to her when her testimony was in play. Exactly what was she told when the possibility of changing testimony came up? That occurred at a second trial. That was Mr. Maddox's trial. I understand that. What was she told? What did you tell her? What happened was prior to trial, this is pre-trial, she came and she was crying. She said the word on the street is they're going to hurt me or my daughter or my kid. And I said, listen, you know, if you need something from us, protection, whatever, moving, whatever, that's something. But you've testified already. Are you going to testify truthfully? And she nodded her head. And then we went to the jury. Keep in mind, her testimony in the Maddox trial was 180% opposite of what she testified to. So where does this come from, then, that you supposedly told her that she'd be committing perjury if she changed her testimony? That's their speculation. That's the word of Pequena's sonnets. She said something to the effect that the government says I really testified one way, and if I testify a different way, that I could be prosecuted for perjury. That was her word in a sidebar conference, I believe. The court asked her about that and asked her will she, you know, tell the truth. And she says, look, I just don't remember what I testified to at the first trial. And so the government did nothing to preclude her from testifying at the Maddox trial, the second trial, as to what her perceptions were. She helped Maddox in the second trial. If you read the transcript, everything she did, she tried to explain away Maddox's conduct, which leads us to the Minnesota question the court had. Let me fill the court in on that. What happened was Mr. Maddox was arrested for two robberies in Minnesota. The AUSA in Minnesota contacted our office and told us about this. We contacted his lawyer, John Hughes. We met with Mr. Hughes. Hughes was trying to work out a deal for Maddox. We went and spoke to Maddox. And in speaking to Maddox, basically our protocol on all of the witnesses was not to give them any discovery whatsoever. Mr. Vaughn, Mr. Slater, Vickina Sutter, none of them received any discovery, not their attorney, not the witness. And that was a choice that we made to preclude any argument that they were influenced by somebody else's statement. So nobody got any discovery in this case throughout the whole trial. And even to today, they still haven't got the discovery. So what happened in Minnesota was we went up there. Mr. Maddox basically identified using the bank surveillance photographs who he was and who the other two masked, kind of covered with the headgear, the hats and stuff like that, who they were. He identified them by their moniker, told the government exactly what happened in the robbery in Manteca, described all that stuff. And then he decided to change his mind because he was the subject of indictment in the Central District. He wanted something done about that, too. He wanted a global settlement of that. We were not about to do that because that involved the killing of a normal car guard. So Maddox, we're not going to use you as a witness. Then at trial, he testified. He came up with this cockamamie story that all that information he gave the government in Minnesota was something the government told him to say. The government pointed out who they wanted him to identify and gave him the names and all that kind of stuff. Well, if that's true, it would have been simple for Mr. Bigelow to just simply subpoena Mr. Hughes, who was present, with his associate, who was another attorney, simply subpoenaed them to court to say, yes, the government is the one responsible for this. In Mr. Maddox's testimony, he says that the reason why he knew these facts, and it's in the record, is because the Kenan-Suddath mailed him all those facts. That's how he knew those things. And that's where the tie-in between the Kenan-Suddath and the Minnesota lawyer. Keep in mind, the associate of John Hughes, who was present during the debriefing in Minnesota, was called as a witness in the Maddox case. So you're saying Maddox received a letter from Suddath explaining all these facts, mailed him? Maddox claimed that in his testimony. No letter? There was no letter. He never produced it. Did she deny that? She denied it. She said, I don't know what you're talking about. It's because Maddox made it up. He had to explain how he got these pertinent facts if he wasn't present. He had an alibi defense that he was down in Los Angeles getting chiropractic treatment. So in your view, all of this goes nowhere on the issues that we're dealing with. Exactly. What about the vouching allegations? Well, the vouching allegations, as to the first one, if the court would take a look at page 44 of my brief, I quoted, it's very long, particularly 44. This is what happened. The so-called purported vouching occurred during rebuttal argument. This is after about a six-week trial. These are the comments made by Williams' attorney and Arsenal's counsel, where they basically attacked the cooperator's testimony via the plea agreement. Now, these are very, very extensive attacks on page 44. On 44. Whereabouts on 44? Well... Not the government? In the top one, the, I think, third sentence, and Mr. Wong is a sole arbitrator of whether or not he should be getting that 25 years under the plea agreement. He's claiming that government is a sole arbitrator. Now, this is page 44? On page 44 of the government's brief. Page 43. Yes. I'm sorry, I'm not following you. Where are you? Okay. On page 44, the, I think, the third sentence down, and Mr. Wong is a sole arbitrator of whether or not he should be getting the 25 years under the plea agreement. Well, that's not the case. It's the judge who's the sole arbitrator, and the final arbitrator of any sentence. And then you go down to the other comment by Mr. Arsenal's counsel, and that's even worse. I mean, that is a very extensive attack. Now you're on page 44? Yes. Still on, say, page 44. It's about halfway down that page. There's an extensive attack on the government and the plea agreement. In the middle of that, it says that if you give the government information that is helpful to the government, and you know this, you're under a lot of pressure. You've hired an attorney. Is that a situation that is conducive to getting truthful information? A desperate guy with these priors who sees this as the only way out. Are you going to give them good information? I mean, I wonder what Mr. Jackson would say if I told him I could make him a deal that I could knock 10 years or more off his sentence. There's absolutely nothing wrong with that argument as far as I can tell. Well, that may be true. It doesn't allow you to throw the prestige of the government and the court behind the truth of the word. Well, the government wasn't trying to throw the prestige. I was trying to make it clear that. But this argument is perfectly fine to attack the credibility of these witnesses. But the government also has a responsibility. I don't see where you get to say the judge has been present as well as I. I can assure you that neither one of us are gullible or that we're not going to fall for a bunch of lies. I mean, that sounds to me like something that you'd show at the nap down in Columbia as an example of vouching. You're throwing your prestige and the promise that the judge will watch these things carefully and there will be no lies. I mean, that's a Columbia NAC vouching example. Well, Your Honor, in the heat of that particular. NAC is the Training Institute of the United States Department of Justice in Columbia, South Carolina. Go ahead. I was aware of that. Thank you, Your Honor. But I was not attempting to do that. I was attempting to show. You may not have been attempting to do that, but you did it. I mean, that I can assure you. That is classic. You're in trouble. Well, Your Honor, I understand the court's position and I understand obviously something that I probably would never say again. I hope not. Yeah. But in the heat of what happened here, he was referenced to in context. That's a problem. A future. The heat doesn't entitle you to go over the line. I mean, you know, you've been around, I guess, for a while. I don't know you at all, but you've been around for a while. You know you were expecting a frontal attack on the credibility of these witnesses. And you can't say, don't worry, the judge and I assure you that there will be no lies. No, that's not what I was attempting to say. I was saying that the judge is a former arbitrator of the sentence of these people in the future and that he will determine whether or not the person lied. It's a future assessment. It's not a past assessment of his credibility. The past, too, because you put these witnesses on and you're telling the jury effectively that they're credible. None of us are gullible. We're not going to fall for a bunch of lies. That covers the whole gambit from when you decide to put them on and when they go before the judge for sentencing. Well, again, I indicated to the court it's obviously set in the heat of the trial and it's something that perhaps would never happen. No, it's obviously would not happen. It's not a curative instruction. I mean, I've seen hundreds of those where the defense pops up, as should have happened in this case, and said, Your Honor, this is vouching. And then the judge says, Ladies and gentlemen of the jury, you will disregard any comments made by the prosecutor regarding me and him and lies or whatever. Then there's going to be a motion for a mistrial right on the spot. Then you have to hassle with that. So the curative instruction wasn't a curative instruction. The curative instruction was a simple, as counsel said, instruction that you get at the end of all of these cases. I don't think that helps you at all. Well, I think the curative instruction is a little different in this case. If you take a look at the very page 48 of the government's brief, this instruction was given to the jury at the very end. And this is a lot more extensive, a lot more detailed instruction regarding credibility than your normal instruction that's recommended by the judge. Who submitted this instruction to the judge? It was a collaboration of the defense and the government. Well, actually, the government submitted it. The court tailored it. The defense looked at it, and they had no objection. I don't see anything in here at all that cures the vouching mistake. That's a standard instruction. I've seen instructions like that five times longer. Everything in there comes from a case that's been decided in the Ninth Circuit of the Supreme Court. Well, throughout the trial, the court reminded the jurors on numerous occasions that the counsel's statements or argument is not that way. That's what vouching is, though. I mean, that's what vouching is. I mean, vouching always occurs in final argument, and you're not protected by the fact that counsel's statements are an argument. I mean, you said we can assure you that we're not gullible, we're not going to fall for a bunch of lies. That envelops the witnesses in your promise that these people are telling the truth. In light of the fact that the case was not a close one, it's not like the counsel said, it's not a close one. The case is not close? The case was not close. The case against the defendants in this case was not close because... What do you have besides the cooperators? Mr. Vaughan's testimony was so detailed and so persuasive. What was Vaughan getting in return for his testimony? He received a sentence of reduction of 50%. He's a cooperator, though. Right. He was a cooperator, but his testimony was corroborated. What do you have besides the cooperators? I mean, these are the people that you promised would be telling the truth. Right. But if you look at it in the vacuum... What do you have besides the cooperators? The corroborating evidence, Your Honor. What's that? Vaughan said the meeting occurring at the Motel 6, that was corroborated by the guest registration slips. He said... Are the criminals' names on the slips? He said that the girl would be the one... She's not involved in the robbery. No, but she was the person that was used by... It was her name on the registry slip? Yes, exactly, on both of them. DeMond Vaughan testified to the exact facts that occurred in the Manteca Bank. This was corroborated by all of the witnesses. There's very unusual facts that occurred in the bank, and he was right on every single point, and that's in the government's name. Corroborating usually doesn't have to go to the existence of the crime. It has to go to the identity of the perpetrators. Well, he also... There's no doubt there were these robberies. The question at play is who did it. But, see, this case is different, in the sense that the government's protocol at the very beginning was not to provide any of the cooperators any of the reports of anyone. So when they gave their statement, they gave it without any influence by anyone else, and they all, Slater, Amos Jackson, to Tina Suttoth, who testified as a witness, not a really cooperative... So it's all internally consistent. And they're all consistent. And they did not know what the other person had said. That is powerful, convincing evidence, and that was brought to the trier of fact, and they believed these people because they were on all fours regarding the evidence. So that's really all you have, is they were internally consistent, they all told the same story, and Suttoth. And it's corroborated by witnesses at the bank, by other... And witnesses at the bank didn't identify anybody. You have this funny identification that really doesn't carry a lot of weight years later, does it? Well, even Maddox admitted he was the one who participated in Minnesota. I mean, he identified himself and the other cooperators as the people who were participants in the Manteca robbery. He did that, and he signed each of the photographic lineup with his initials and the date. That corroborates that also. Why are they vouching to say the FBI solved this case because of the testimony of this witness? Well, that's exactly what happened. The FBI had no information. That may be what happened, but you can't say it. Well, Your Honor, I don't understand how that is so... It says the FBI solved the case. Isn't that a way of saying what the FBI has given you, the FBI stands behind? Well, I understand the court's point, but simply... Doesn't it say that, the FBI believes all of this? You understand the FBI believes... Have you thrown the reputation of the entire Department of Justice behind the truth of these cooperators? I'm certain that the government next time would probably rephrase it differently to the point that the FBI got leads from this person instead. It was said, it was not objected to, it was a minor point in a long, long six-week trial. I don't think it had much impact on the jurors' decision in this case who relied on the evidence that was produced. You don't think? How do we know? We have no idea what impact it had on the jurors. Well, they were asked to try the case... Did you ask them after the trial was over? Did what I said about promising that the judge and I wouldn't be gullible had any impact on the verdict? Did you ask them that? No, we did not, Your Honor. You know, I know how this happens. I've tried cases for 27 years. You get in the heat of battle and you say things like this, and after you wake up the next morning, you wish you hadn't. I think every trial, we wish we hadn't done certain things. That occurs with human nature, the error that we make as human beings. But we try the best we can. In this case, I think that we obviously said some things that we wish we could take back, but I don't think that... The references to the stuff in the plea agreements about telling the truth, that's really not much, but the other statement about you and the judge, that's reasonably serious. I understand that, Your Honor. Counsel, do you want to say anything about the seriatim witnesses, the point made by Mr. Wiseman? Yes, to answer that, you know, the thing that they did not cover is the court gave them an option. And the option was, we can give you a short recess because the amount of discovery was not that much. For each one of the cooperators, it was about 30 pages or so. I think Mr. Slater, it was 46, but most of them were like 27 to 30-something pages. So it wasn't a lot of discovery. A lot of it was like the rap sheet that was included, identified who they were, things like that. There's nothing about the discovery that was a powder keg. The court gave them an option of taking a short recess and preparing after each witness' testimony, or to take a longer continuance, but the government, to move the trial along, would continue with this examination. They chose the latter. They were given a sufficient time, five days, to do that. Now, a case can also be made that this could have benefited the defense, too. By hearing the testimony of all the cooperators, they can arm themselves more effectively in cross-examining the very first cooperator. They now know what all the cooperators said. They can compare the testimony and use that as a vehicle to go ahead and effectively cross-examine the first cooperator when they had an opportunity. But there's nothing in here, in the defendant's briefs, to indicate any prejudice they suffered whatsoever from the mode of interrogation that the court had. It's an abusive discretion standard. The court considered how long this trial was. It was a three-defendant case. There were a lot of witnesses. It lasted approximately, I think, six weeks or so, and the court wanted to move it along. So I don't see anything in the defense briefs to indicate any prejudice they suffered from this. Anything further, counsel?  No questions from the court. Rebuttal, counsel? I'm going to talk really fast here. Suddath repeatedly denied knowing Maddox. Repeatedly denied knowing Maddox. She acknowledged that she knew of him. She denied that she knew him. There's a difference. Mr. Wong, in their case, argued extensively against an evidentiary hearing. It's the only way I can interpret their language. That appears in their transcript at page 931 of the Williams trial. I did not call Hughes, but I called his associate. He testified extensively. It's in my excerpts of record. The key part is at about ER 139. Maddox was a classic cooperator. Tell them what they want to know so that I can get out of here. He didn't know about he testified as well. He didn't know about Sacramento, about the Eastern District. He needed information on it. He got information on it. He wasn't going to tell them about it. He gets pressured by his lawyers. It happens. I can't help it. Was he under investigation in the Central District, as Mr. Wong just said? Yes, he was under investigation in the Central District. And his lawyers in Minnesota wanted a global settlement? I think that that's the case. But I don't know that. I know that L.A. wanted a separate settlement. And that case, as far as Mr. Maddox is concerned, is over and done with. Trial starts tomorrow. He's not part of it. Thank you. Go ahead. Just 30 seconds, Your Honor. I heard Mr. Wong say that the agents were questioned about whether or not there were understandings between them. As I read the record, I didn't find that. I could be wrong, but my recollection is that there were no questions. I think they stayed away from it because they didn't have any goods. That's why they wanted a hearing. They stayed away from it because they didn't have any goods? Who's they? The defense counsel. Because they didn't have a hearing. Your Honor, just briefly, I just want to emphasize one point that Judge Trott, I think, emphasized. There was no corroboration against Mr. Arsenault in this trial. It was a case that was built upon the government's cooperating witness. There doesn't have to be in federal court. It's not like 11-11 in the state court. I'm aware of that, Your Honor. But I just want to emphasize that again. Thank you. In terms of assessing, this Court's assessing the independent, the substantial independence of guilt of the defendants in the Manteca trial, the only thing that this Court can look at, really, is the testimony of the keen assessor. And on the record, and I cite it extensively to the excerpts of record and the government adopted my excerpts of record. The government did not submit its own. So the government's adopted my excerpts of record. There is extensive testimony that Ms. Suttis drove from Los Angeles in a convoy. This is not a hop, skip, and a jump to Manteca. It's at least a four-hour trip. She rented multiple hotel rooms. Instead of being in a car at a distance, as the government characterizes it, Demond Vaughn said that she was in the lookout car across the street from the financial center, a lookout car, with Papa Slater, Rogers, and Arsenault. She then went to the house and personally saw the counting of several hundred thousand dollars in cash. This is on the record. Let me try to figure out what you're doing. You're saying that all of this is not independent. And then she said, on the record, Your Honor. Excuse me for interrupting you. Go ahead. I'm sorry, Your Honor. Go ahead. I need to slow down. I think this is a really important case. On the record, and I quote this in the excerpt, Ms. Suttis said that she did not realize there was something wrong until her ride back to Los Angeles. The point that you're trying to make is that she must have said, am I going to get prosecuted, and somebody must have said, no, you're not. Is that the point you're trying to make? No, that's not my point, Your Honor. What's your point? The point is that this is not the substantial independent evidence of guilt that's required that supports a conviction. So you're saying that she, too, is a cooperating crook. I think that the evidence is clear as to that, but that's not necessary for this Court to find that. This Court has to look at her testimony, because that testimony alone is what supports the conviction in the Manateeca case. Mr. Vaughn, and then I'm going to end, Mr. Vaughn changed his testimony from the grand jury to coincide with what the evidence was. There was not a gunshot in Manateeca. It was a canister dropping. Mr. Vaughn told the FBI that there was a gunshot, and then he changed his testimony at the time of trial. Finally, perhaps Mr. Vaughn's testimony could have supported a conviction in the Manateeca case, but the government specifically said that law enforcement solved this crime because of law enforcement. And then at the end... Law enforcement solved it because of law enforcement? Because of Vaughn. And then at the end, just before the closing, this was not an isolated incident. Mr. Vaughn said, we, we did everything we could. We, law enforcement, did everything we could, and then he changed it. We understand your argument, counsel. Thank you. Your time has expired. Thank you, Your Honor. I believe that the record and the law support a reversal of the convictions in this case. Very well. Thank you very much, counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Trott, Paez